UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTIN NANCE,<br><br>       *Plaintiff*,<br>-against-<br><br>NEW YORK PUBLIC INTEREST RESEARCH GROUP,<br><br>       *Defendant*. | Case No. 1:18-CV-11558<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

### NATURE OF ACTION

1. Plaintiff Kristin Nance ("Nance" or "Plaintiff"), by her attorneys, Crumiller P.C., brings this action against the New York Public Interest Research Group ("NYPIRG" or "Defendant") to remedy claims of sex discrimination, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), as amended by the Pregnancy Discrimination Act; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq*.; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*..

### PARTIES

2. Plaintiff Kristin Nance is a 35-year-old woman and mother who resides in New York City. Until her employment was terminated in September 2017, Nance was the Director of NYPIRG's "Telephone Outreach Program", a fundraising program which secures a large portion of NYPIRG's revenue. Nance was an employee of Defendant as that term is defined in Title VII (42 U.S.C. § 2000e[f]) and the NYSHRL (N.Y. Exec. Law § 292[6]), and entitled to the

remedies of the NYCHRL (N.Y.C. Admin. Code § 8-102), for purposes of the claims brought in this Complaint.

3.      Defendant NYPIRG is a not-for-profit organization which purports to advocate on behalf of the public good in a variety of civic campaigns, involving issues such as the voting rights, government accountability, and the environment. Its principal place of business is 9 Murray Street, #B1, New York, NY 10007. NYPIRG has an annual operating budget of approximately five million dollars, and employs approximately 60 to 100 people state-wide, most of whom work as fundraisers in NYPIRG's telephone and in-person fundraising (canvassing) initiatives.

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction over Nance's claims pursuant to 28 U.S.C. § 1343. This Court has supplemental jurisdiction over Nance's state and city law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391(b)(2).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      On March 7, 2018, Nance filed a timely Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC").

7.      More than 180 days has elapsed since the EEOC assumed jurisdiction over the Charge.

8.      On September 14, 2018, upon Nance's request, the EEOC issued a Notice of Right to Sue to her.

## LEGAL FRAMEWORK

9. Under Title VII, it is an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual" with respect to the terms, conditions, or privileges of employment, because of the employee's sex. 42 U.S.C. § 200e-2(a)(1). This includes discrimination on the basis of "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

10. The NYSHRL provides that it shall be an unlawful discriminatory practice "to discharge from employment . . . or to discriminate against such individual in compensation or in terms, conditions or privileges of employment" on the basis of an individual's sex, N.Y. Exec. Law § 296(1)(a), or "familial status", *id.,* which includes pregnancy. N.Y. Exec. Law § 292(26)(a).

11. The NYCHRL similarly provides that it is unlawful for an employer to "discharge from employment" any person on the basis of her gender or caregiver status, N.Y.C. Admin. Code § 8-107(1)(a)(2), or to "discriminate against such person . . . in terms, conditions or privileges of employment". (a)(3).

## FACTUAL ALLEGATIONS

### I.    Summary of Facts

12. Nance began working for NYPIRG in May 2012 as a street-level canvasser. She rose quickly through the ranks, establishing herself as a star fundraiser and manager, with a reputation for running a tight ship, holding her team accountable, and exceeding performance goals. By 2016, she had been promoted to Director of NYPIRG's entire Telephone Outreach Program ("TOP"). That season, she broke several fundraising records within the organization.

13.     Nance's employment continued without incident until she disclosed her pregnancy in July 2017 to her supervisor. The very next day, NYPIRG's Executive Director, Blair Horner, began pressuring Nance (and Nance alone) to resign her employment, citing purported budgetary constraints.

14.     Faced with enormous stress and anxiety, Nance suffered a miscarriage, and lost her pregnancy at nine weeks.

15.     Upon Nance's return, her supervisor asked if she intended to become pregnant again. When Nance responded affirmatively, the threats immediately resumed. On September 1, 2017, NYPIRG terminated Nance's employment.

16.     The purported financial concerns were demonstrably pretextual. No budgetary or managerial plans were ever made which would have restructured or eliminated Nance's role, whether before or after the termination, and additional employees were hired for new positions created at the time Nance's employment was terminated.

17.     Further, not a single other employee was terminated, including similarly-situated, lower-performing colleagues, with less seniority.

18.     Nance was replaced by a male employee who was paid the same salary as she had earned, revealing the purported budgetary concerns to be a farce.

## II.    Nance's Stellar Employment Background

19.     NYPIRG's fundraising efforts primarily involve the use of street "canvassers": independent contractors whose primary form of income consists of a percentage of the funds they raise by soliciting donations on the street and door-to-door.

20.     NYPIRG first hired Nance as a canvasser in May 2012.  NYPIRG immediately recognized Nance's excellent fundraising capabilities and managerial skills, and promoted her to Field Manager within two weeks.

21.     As a Field Manager, Nance continued her individual canvassing, but also managed a team of five to seven canvassers by organizing and distributing their geographical routes, training new hires in the field, and managing and depositing the funds collected by the team.

22.     At this time, NYPIRG employed approximately twenty Field Managers.  Of these twenty, Nance was ranked second in fundraising.  She raised amounts well above what the vast majority of field managers were able to raise, and raised funds well in excess of her salary, making her the most profitable of the field managers.

23.     From May 2013 through April 2016, Nance continued to work for NYPIRG in varying capacities and with increasing responsibilities, first as Outreach Director (Canvassing Director), then as an Outreach Supervisor.[1]  In these roles, she performed a large variety of tasks.  She recruited, interviewed, hired and trained staff; presented skills trainings and briefings; coordinated schedules, conducted daily debriefings, and supervised large teams: first, teams of canvassers, and then teams of regional Outreach Directors.

24.     In May 2016, Nance was promoted to Statewide Outreach Manager, a summer position[2] wherein she coordinated and managed all canvassing offices, including openings of seasonal satellite offices, utilities, communications, technology, office inventories, and payment

---

[1] The terms "Outreach" and "Canvassing" were generally used interchangeably within the organization, with the term "canvassing" being more commonly-used internally.
[2] During the months of May to August each year, NYPIRG increases its NYC staff, and opens 8 to 9 seasonal canvass offices throughout the state.  Most of its canvassers are college students, around whose schedules these efforts are organized.

processing; organized statewide events; and ensured compliance with all municipal canvassing regulations.

25.     In September 2016, when the position of summer Statewide Outreach Manager had concluded, Nance was promoted to Telephone Outreach Project ("TOP") Director.  As TOP Director, she hired and trained the staff of telephone fundraisers, which included approximately 10-15 telephone fundraisers at any given time.  The team she managed called approximately 60,000 of NYPIRG's donors, securing approximately 2,800 donations.

26.     In addition to her managerial responsibilities as TOP Director, Nance continued to fundraise by placing calls to current and prospective donors.

27.     Under Nance's management, her team raised over $500,000, with Nance personally accounting for over $60,000.  Her salary at this time was approximately $35,000, plus a 20% commission on her own fundraising.

28.     As such, notwithstanding statements about budgetary constraints, Nance generated more revenue than required to maintain her position while performing managerial duties.

29.     The amount Nance raised, as TOP Director, dramatically exceeded the amount any other TOP Director had raised in at least the past decade.

30.     In May 2017, when canvassing season resumed, Nance resumed her role as Statewide Outreach Manager.


        **III.   Upon Announcing Her Pregnancy, Nance Faced Immediate Pressure to Resign**

31.     On June 15, 2017, NYPIRG's Deputy Director, Marvin Shelton, approached Nance's significant other, Brenden Colling, Statewide Outreach Director, to ask Colling if Nance was

pregnant.[3] According to Shelton, he had noticed Nance wearing dresses, when she usually wore pants. Taken aback, and unsure of how else to react in the moment, Colling suggested the question was inappropriate, and Shelton did not pursue the matter with Colling.

32. At the end of June of 2017, Nance advised her immediate supervisor, Diana Mihailovich, Development Director, that she was pregnant. Mihailovich was widely known to share a close personal relationship with Horner, the Executive Director.

33. The very next day, Horner summoned Nance to an unscheduled meeting. At the meeting, Horner explained to Nance that NYPIRG was eliminating positions due to budgetary concerns, and that her employment was likely to be terminated. He encouraged her to begin looking for employment elsewhere immediately. At this meeting, Horner claimed surprise when Nance mentioned that she was pregnant.

34. At this time, Nance was one of approximately 26 salaried staff in NYPIRG's summer canvass whose positions ended August 31. None of those other employees were advised that they may not be assigned to another job past August, or that their employment may be terminated.

35. Nance suffered great stress and anxiety over the prospect of losing her job. As a pregnant woman, she realistically understood her options for reemployment to be limited, and she relied upon her income to make ends meet.

36. Shortly thereafter – on July 7 – Nance suffered a miscarriage and lost her pregnancy at nine weeks.

---

[3] The "Statewide Outreach Manager" manages the summer canvassing teams. The "Statewide Outreach Director" manages the Statewide Outreach Manager and canvass teams, the TOP department, and the winter canvass teams.

37. Nance returned to work several days after the miscarriage. However, she began bleeding profusely, and was rushed to the hospital, due to medical complications.

38. The day Nance returned to work, after a one-week medical leave, Mihailovich asked her if she intended to become pregnant again. Nance truthfully responded that she did.

39. Horner immediately began escalating the pressure on Nance to seek employment elsewhere. He frequently repeated his many admonitions to Nance that her job security was not guaranteed past August.

40. These communications made Nance extremely uncomfortable and anxious. She was the only employee subject to pressure to resign her position, although there were many similarly-situated employees, most of whom were lower-performing. Horner gave no explanation for the frequency and tenor of these communications, aside from the purported budgetary concerns.

41. In August 2017, Horner asked Nance to submit her resume to the New York State Trial Lawyers Association, which had a job opening. Nance complied, but she also reiterated to Horner that her strong preference was to remain employed by NYPIRG, even if it was in a different capacity, and that as such, she was available either for the position she had successfully completed the prior winter (TOP Director), or any other openings NYPIRG had available.

42. Both Nance and Colling took note that nobody but Nance had been notified that their employment was in jeopardy. On August 13, 2017, Colling emailed Horner, "We didn't give Julian [Moore] or Steve [Edwards, the other Outreach Directors] a warning that they may not have jobs past August." Horner did not respond.

43. Nance repeatedly asked why she alone was singled out for termination, given her excellent performance, but Horner refused to answer.

8

44. At the same time Horner continually threatened Nance's termination, new and additional fundraising positions were being added throughout the outreach department. In the midst of what NYPIRG claimed (to Nance) were budgetary shortfalls, it hired three new Outreach Directors in New York City, and a fourth in Rochester.

45. Colling, who oversees the outreach department, is typically consulted on any major budgetary decisions impacting NYPIRG. Yet, he was never presented with, or notified of, any plan for any restructuring or reorganization that would have impacted Nance's employment.

### IV. Nance Was Fired, Purportedly for Budgetary Reasons, Then Replaced by a Man at the Same Salary

46. On September 1, 2017, NYPIRG terminated Nance's employment. That day, Horner reiterated NYPIRG's position that the termination was not due to performance, but exclusively due to the budgetary concerns.

47. Of NYPIRG's approximately sixty salaried employees, Nance was the only employee who was terminated at or around that time. Many other similarly situated employees kept their jobs, including five other Outreach Directors in NYC – all of whom were lower-performing and of lesser seniority than Nance – who continued their employment in various capacities.

48. While one other employee, Robert Kornblum, had resigned voluntarily, he was first offered several positions that NYPIRG refused to offer to Nance, although Nance had agreed to accept those positions.

49. Later on the day she was terminated, Nance filed a complaint of discrimination with NYPIRG's "Redress Committee," a group of employees convened in accordance with its internal policies to field discrimination complaints, demanding reinstatement as TOP Director.

50. On September 14, 2017, Colling submitted a memorandum to the Redress Committee, confirming that on June 15, 2017, Shelton had asked him whether Nance was pregnant. He also stated in that memorandum that no plans for restructuring TOP or reasons for terminating Nance's position were ever discussed with him.

51. Thereafter, Horner asked Colling to create a proposed restructuring plan in which the TOP Director position could be eliminated. Colling refused, stating that the request appeared to be an attempt to reverse engineer the unjust firing, and Horner dropped the matter.

52. NYPIRG placed a temporary freeze on hiring for the position as a result of the pending complaint. Pending a permanent arrangement, Colling performed the TOP Director duties in September and October 2017.

53. On November 1, 2017, the Committee informed Nance that it had found "no evidence" of discrimination. No further explanation was given. Shortly thereafter, NYPIRG hired a male employee to replace Nance as TOP Director, at the same salary.

### FIRST CAUSE OF ACTION:
**Discrimination in Violation of Title VII**

54. Nance repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

55. NYPIRG improperly discriminated against Nance in the terms and conditions of her employment, and improperly terminated Nance's employment, on the basis of her sex, in violation of Title VII.

56. NYPIRG's discriminatory acts caused Nance to suffer economic damages, including lost wages, commissions, and benefits, as well as emotional distress and physical injuries.

57. NYPIRG acted with malice and/or reckless indifference to Nance's rights, entitling her to an award of punitive damages.

## SECOND CAUSE OF ACTION:
### Discrimination in Violation of the NYSHRL

58. Nance repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

59. NYPIRG improperly discriminated against Nance based on her sex, in violation of the NYSHRL.

## THIRD CAUSE OF ACTION:
### Discrimination in Violation of the NYCHRL

60. Nance repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

61. NYPIRG improperly discriminated against Nance in the terms and conditions of her employment on the basis of her sex, including her pregnancy, in violation of the NYCHRL.

62. Moreover, NYPIRG acted with malice and/or reckless indifference to Nance's rights under the NYCHRL, entitling her to an award of punitive damages.

## DEMAND FOR RELIEF

WHEREFORE, Nance respectfully requests that this this Court enter judgment that:

a) Declares that the discriminatory actions, practices, and policies of NYPIRG as set forth above violated Title VII, the NYSHRL, and the NYCHRL;

b) awards monetary damages to Nance to compensate her for the discrimination she experienced, including economic damages, and damages for emotional distress and physical injuries;

c) awards Nance punitive damages;

d) awards Nance reasonable attorneys' fees and costs; and

e) grants such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Nance demands a trial by jury.

Dated: New York, New York
December 11, 2018

Respectfully submitted,

Crumiller P.C.

By: \_\_\_\_/s/_____
Susan K. Crumiller (SC9547)
222 Broadway, 19th Floor
New York, NY 10038
(212) 390-8480
susan@crumiller.com
Attorneys for Plaintiff